IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KIMBERLY A. KENT,

      Plaintiff,

      v.                              Civil Action No. 1:06-cv-41

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

Plaintiff, Kimberly A. Kent, (Claimant), filed her Complaint on March 16, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on October

12, 2006.[2]   Claimant filed her Motion for Summary Judgment on November 13, 2006.[3]

Commissioner filed her Motion for Summary Judgment on December 5, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

        2.    <u>Commissioner's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 12.

[4] Docket No. 13.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED because the ALJ failed to properly consider Claimant's testimony and did not evaluate the effects of Claimant's mental impairments when making his residual functional capacity assessment.

2.     Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.     Procedural History

Claimant filed her application for Social Security Disability Insurance Benefits on October 1, 2003, alleging disability since April 12, 2003.  The application was denied and initially and on reconsideration.  Claimant requested review by an ALJ and received a hearing before an ALJ on January 5, 2005.  The ALJ issued a decision adverse to Claimant on February 3, 2005. Claimant filed a request for review from the Appeals Council, but it denied this request. This action was filed and proceeded as set forth above.

B.     Personal History

Claimant was 29 years old on the date of the January 5, 2005 hearing before the ALJ. Claimant has a GED. Claimant has prior relevant work experience as a social worker.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: April 12, 2003 – February 3, 2005.

**Thomas A. Lauderman, M.D., 8/30/03, Tr. 111**
Ord. diagnosis: lumbar stenosis/pain

Impression from lumbar myelogram: mild extradural thecal sac impress at L4-5 on the lateral projection, suggesting disc disease.

Impression from computed tomography lumbar myelogram: mild to moderate central focal disc herniation at L4-5 with possible small downward migrating fragment. There is no evidence of either central or lateral spinal canal stenosis. The neural foraminal are patent.

**Thomas A. Lauderman, M.D., 6/16/03, Tr. 121**
Ord. diagnosis: strain

Impression: small to medium sized central herniation at the L4-5 level.

**Thomas A. Lauderman, M.D., 4/21/03, Tr. 167**
Impression: some straightening of the lumbar lordosis

**Thomas A. Lauderman, M.D., 4/8/02, Tr. 171**
Impression: no abnormality of the lumbar spine. Densities in the pelvis are likely phleboliths, but correlation with clinical findings is needed.

**Brenda Hinkle, M.A. and Robert Klein, Ed.D., 12/3/03, Tr. 172**
Diagnostic impression:
Axis I: major depressive disorder, recurrent, moderate, adjustment disorder with anxiety
Axis III: herniated disc as reported by a note from Doctor's Quick Care, PLLC dated 10/18/03

Prognosis: guarded

**B.J. Kerbyson, D.O., 12/29/03, Tr. 177**
Impression: moderate obesity, lumbar disc disease, history of depression

**Psychiatric Review Technique, 1/2/04, Tr. 184**
Medical disposition: impairments severe but not expected to last twelve months
Categories on which disposition is based: affective disorders, anxiety related disorders

The patient has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:
    The patient has depressive syndrome characterized by appetite disturbance with change in weight, sleep disturbance, feelings of guilt or worthlessness, and difficulty concentrating or thinking

Under the heading of anxiety disorders, the patient is listed as having a disorder written by the evaluator. The diagnosis is illegible, except that it appears to say "anxiety" after other notations.

Functional limitation:
      Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, and pace: mild
      Episodes of decompensation, each of extended duration: none

**Physical Residual Functional Capacity Assessment, 1/29/04, Tr. 198**
Exertional limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Ghazala Kazi, M.D., 11/3/03, Tr. 209**
Impression: lower back pain

**Workers' Compensation Division, 11/3/03, Tr. 217**
Inspection
      Patient stands unassisted: yes
      Scoliosis, antalgic lean, lumbar hypolordosis, lumbar hyperlordosis: no

Palpitation
      Vertebral tenderness/restriction, coccyx tenderness, sacral base and pelvis level: no
      Paraspinal muscle tenderness (left and right): yes
      Paraspinal muscle spasm: no
      Sacroiliac joint tenderness: yes

Gait
      Limp: no

Squat
      Squats fully and rises without difficulty: yes

Range of motion
      Sacral flexion: 50 degrees
      Sacral extension: 0 degrees, pain
      Forward bending: 50 degrees
      Backward bending: 25 degrees, restriction

Left side bending: 20 degrees

Motor strength
Hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle dorsification, ankle planter flexion: normal

Sensory
L3 sensory (left), L4 sensory (left), L5 sensory (left), S1 sensory (left): diminished
L3 sensory (right), L4 sensory (right), L5 sensory (right), S1 sensory (right): normal

Reflexes (+2 normal)
Patellar (left and right), achilles (left and right): +2

Straight leg raising (sitting)
Left: 80 degrees, pain: no
Right: 90 degrees, pain: no

Hip and sacroiliac tests
Hip test pain: no
Sacroiliac test pain: no

Straight leg raising (supine)
Left: 50 degrees, pain: yes (in back)
Right: 60 degree, pain: yes (in back)

Pulses
Dorsal pedis (left and right): present
Posterior tibial (left and right): present

Muscle measurement
Left and right thigh: 60
Left calf: 44
Right calf: 44.5

Clinical impression of somatic amplification
Sensory examination: response to pinprick
Non-dermatomal or very inconsistent deficit
Amount of body involved: 15-35 percent
Motor examinations
No deficit or deficit well localized to myotomes
Amount of body involved: less than 15 percent
Tenderness
Tenderness not well localized, some inconsistency
Amount of body involved: 15-35 percent

Differential straight leg raising

The difference between SLR tests performed in the supine and sitting positions. Example: supine SLR positive at 10, seated SLR positive at 50, difference equals 40: 20-45 percent

Clinical diagnosis:

Lumbar sprain/strain

Lumbosacral sprain/strain

**Stacy (Illegible), 3/9/04, Tr. 221**
Diagnostic impression:

Axis I: mood disorder due to herniated disc and depressive feature, R/O generalized anxiety disorder

Axis III: herniated disc

Axis IV: medical problem, unemployment due to medical problem, inadequate housing

Axis V: 70

**United Hospital Center, 3/4/01, Tr. 226**
Clinical impression: chronic pain in the back

**Thomas A. Lauderman, M.D., 12/29/03, Tr. 241**
Ord. diagnosis: congestion
Impression: normal chest

**Z. Jerry Kosel, M.D., 4/30/04, Tr. 251**
Assessment: chronic post-traumatic lower back pain with left sided radiculopathy, lumbar degenerative disc disease, herniated nucleus pulposus at L4-5 as per MRI, lumbar sprain

**Ansaar Rai, M.D., 11/9/04, Tr. 260**
Impression: no abnormalities of the brain identified from an MRI

**Thomas A. Lauderman, M.D., 9/17/04, Tr. 357**
Ord. diagnosis: parasthesia left arm

Impression: this study is normal and is not supportive of carpal tunnel syndrome, ulnar neuropathy, or C5-T1 or L3-S1 radiculopathy on the left side.

**Thomas A. Lauderman, M.D., 9/5/04, Tr. 361**
Ord. diagnosis: cervical neck pain

Impression: negative magnetic resonance imaging scan of the cervical spine

**Thomas A. Lauderman, M.D., 8/18/04, Tr. 362**
Ord. diagnosis: lumbar pain

Impression: negative exam

**Thomas A. Lauderman, M.D., 8/18/04, Tr. 363**
Ord. diagnosis: pain

Impression: straightening of the normal lordotic curvature which may be from spasm or positioning, but otherwise no abnormality

**Shiv Navada, M.D., 11/30/04, Tr. 369**
Assessment: tremors, history of spells, insomnia, depression

**Shiv Navada, M.D., 11/8/04, Tr. 370**
Assessment: tremors, spells that have been resolved

**Shiv Navada, M.D., 10/7/04, Tr. 371**
Assessment: tremors, psychogenic seizures

**Shiv Navada, M.D., 9/28/04, Tr. 372**
Assessment: left arm tremors, low back syndrome, mixed headaches

**Shiv Navada, M.D., 9/16/04, Tr. 373**
Impression: left arm pain, tremors, low back syndrome without clinical evidence of lumbosacral radiculopathy, hyperlipidemia, obesity

**Shiv Navada, M.D., 9/23/04, Tr. 376**
Ord. diagnosis: tremors, seizures

Impression: The electroencephalogram recorded during awake state is abnormal due to mild intermittent slowing noted on rare occasions. This is a non-specific abnormality that may be seen with generalized encephalopathies of many causes.

**Steve M. Barnett, Radiologist, 9/4/04, Tr. 377**
Impression: negative magnetic resonance imaging scan of the cervical spine

**C. David Burtner, 9/14/04, Tr. 379**
Impression: negative contrast cranial CT.

**Ronald D. Pearse, Ed.D., 11/23/04, Tr. 381**
Diagnosis:
Axis I: mood disorder due to medical issues, R/O generalized anxiety disorder, acute stress disorder
Axis III: herniated disc

Medical Assessment of Ability to do Work-Related Activities (Mental), 12/29/04, Tr. 382

Making occupational adjustments

Follow work rules, relate to co-workers: good

Deal with the public, use judgment, interact with supervisors, function independently, maintain attention/concentration: fair

Deal with work stresses: poor

Making performance adjustments

Understand, remember and carry out simple job instructions: good

Understand, remember and carry out complex job instructions, understand, remember and carry out detailed, but not complex job instructions: fair

Making personal-social adjustments

Maintain personal appearance: good

Behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability: fair

**Robert Tallaksen, M.D., 10/5/04, Tr. 386**

Impression: no acute abnormality of the brain

**John Brick, M.D., 10/5/04, Tr. 387**

Diagnosis: dysrhythmia, grade 1 generalized, sleep, no abnormal activation

Clinical interpretation: the EEG demonstrates mild abnormalities during wakefulness. No specific epileptiform activity was recorded.

**Thomas A. Lauderman, M.D., 9/14/04, Tr. 406**

Ord. diagnosis: shaking left arm

Impression: negative contrast cranial CT.

D.     Testimonial Evidence

Testimony was taken at the January 5, 2005 hearing. The following portions of testimony are relevant to the disposition of this case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q     And how tall are you?

A     5' 9".

Q     And how much do you weigh approximately?

A       235.

                        *              *              *

Q       Do you smoke?

A       Yes.

Q       How much?

A       A pack and a half a day.

Q       Is that more than you used to smoke?

A       No.

Q       How long have you smoked a pack and a half?

A       I started when I was about 21, 22.  I didn't start out smoking a pack and a half a

day.

Q       What did you say?

A       I didn't start out smoking a pack and a half a day.

Q       You worked up to it?

A        Yeah.

Q       Okay.  Do you drive now?

A       Yes.

Q       Do you have a driver's license?

A       Yes.

Q       How often do you find yourself driving?  Do you drive every day?

A       Not really.  To Dr. Lauderman's office every other week, grocery store, Dr.

Pierce's office once a week.

Q     When you go to the grocery store, do you go alone?

A     I try to go without my kids.

Q     So yes?

A     Sometimes.  Sometimes not.  Sometimes I take my kids and that way they can help me carry the groceries in.  If I go alone its usually just to pick up a few things.

*          *          *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q     Now you talked a little bit about being in one position too long.  On an average day, how long are you able to sit in a regular chair not leaning like right now you're leaning up on the table.  If you had to sit up without leaning in a regular chair, how long are you able to sit?

A     Not leaning?

Q     Not leaning.

A     I'd say about five minutes not leaning.

Q     And if you can lean forward like you are now on your arms?

A     I'd say I've been here about 15.

Q     So about 15 minutes usually.  Does standing bother you at all?

A     If I stand too long, yeah.

Q     If you were standing in one position and you could shift your weight and things but pretty much in one place, how long are you able to stand?

A     Ten or 15 minutes usually if I move around.

Q     I'm sorry?

A     Usually I got to keep moving around.

Q       How about walking, any problems with walking?

A       They had me on the treadmill.  I think eight minutes on the treadmill at physical therapy.

Q       Do you walk for exercise?

A       I haven't went out and tried it lately.

Q       Now how do you sleep?

A       I got up at 3:00 this morning.

Q       And normally what time do you go to bed?

A       8:30, 9:00.

Q       And what time do you generally get up in the morning?

A       It depends on the anxiety.

                              *              *              *

Q       And what kind of symptoms do you have from the anxiety and the depression?

A       My sleep.

Q       How is your sleep affected?

A       Up 2:30, 3:00 in the morning.  Can't go back to sleep.  Worried about stuff.  My head will hurt, the back of my head hurts for two to three days at a time and it makes my left arm shaky and then make the muscles draw, and then it'll get bad to the point where it will draw the whole thing up.  After about the fourth day of my head hurting and make the muscle flare up in my neck, and then the neck will go like that and end up jerking like that.

Q       And you got your left arm kind of pulled up to your chest.  What you're showing me, I just want to describe it because the tape can't see that.  You got your left arm kind of drawn

up to your chest and you said your neck will pull over to the right?

A      Draws up that way because that muscle comes down and draws up.

*          *          *

Q      How often do you get spells like that?

A      I had three - - three in December.

Q      How long do they last?

A      I'd say anywhere from a minute to a minute and a half.

Q      And after it's over, how do you feel?

A      Usually tears run down my face, and one time my heart was going 90 miles an hour.

Q      How long is it generally before you get back to what is normal for you?

A      A couple minutes until I can relax enough to put the arm down.

Q      Now do you have symptoms in that arm at times other than when you have those spells?

A      Oh, yeah, if I get nervous like right now, shaky.

Q      Are there particular things that will bring on those spells?

A      Yeah.  If I'm at the psychologist's office he'll have my arm going like that big time.  He can bring it out.

Q      Just like when you're talking to him about things?

A      Yeah.

*          *          *

Q      On an average night how much sleep do you get?

A       From 9:00 to say 2:30, 3:00.

Q       And then generally are you up from that point on?

A       On an average I never sleep past 4:00.  I'm always up by 4:00.  And if the anxiety is something like this hearing, I've been up since 3:00 this morning and yesterday morning, so the mornings I am more stressed the earlier it is I'm waking up.

Q       Do you sleep during the day?

A       I'll lay down for an hour or so if my back is hurting or I'm tired.

Q       How often do you do that?

A       Usually just once.  I try not to sleep during the day, then I won't sleep at night at all.  I lay down if my back is hurting.

Q       And generally what time of day is it that you lay down?

A       While my kids are at school, usually around 10:00 or 11:00 in the morning I'll lay down for an hour or something after I try to do dishes.

Q       Now you live by yourself with your children?

A       Uh-huh.

Q       Are you able to do your household chores?

A       Some, some not.

Q       What are you able to do?

A       My kids do most of the chores, the vacuuming.  I have them doing the laundry, put the clothes in and switch them around.  They pull them out and help me fold them.  I do the dishes but it takes me a long time to do them.  I end up - - start out doing them and the next thing I know I got my elbows down on the sink and then I have to go sit down.  And I go back and start over

again. Then I got the elbows down on the sink, go sit down, so it takes me a long time to do them. And the kitchen floor, needless to say it don't get mopped very often. And when it does get mopped, it takes me two hours to do it. I have to sit down several times.

Q       Do you do the cooking?

A       Yes.

Q       What about outside chores?

A       I don't do any of them. My son mows the front yard and my mom's boyfriend mows the back for me.

Q       Do you belong to any clubs or groups or organizations, do you go to church, any kind of social activities?

A       Uh-uh.

Q       You said you go to the grocery store. How often do you go to the store?

A       About once a week.

Q       Do you go out to eat?

A       No.

Q       I'm sorry?

A       No.

Q       Movies, anything like that?

A       Can't afford to.

Q       What about with your children, do they participate in sports or school events or anything like that?

A       Not lately.

BY ADMINISTRATIVE LAW JUDGE:

Q        I just wanted to know a little more about your activities.  Do you get up with the kids in the morning?

A        Yes.

Q        How do they get to school?

A        They get on the bus.

Q        Do you walk them to the bus or is it close by?

A        It's close by.  They go to the bus stop.

Q        So they go without you to the bus stop?

A        Uh-huh.

Q        How often do you eat out?

A        I don't got the money to eat out.

Q        Well, because a year ago - -

A        A year ago my income was higher.

Q        So a year ago you ate out once a week?

A        A year ago I had workers' compensation.

Q        I understand.  I'm just asking.  But you were capable of going out to eat?

A        Yes.

Q        Where did you go, what type of place?

A        I can't even remember.  Where did I go out to eat a year ago?

Q        Well, it said you went out once a week generally but if you don't remember, you

don't remember.  How far is Lost Creek - - you live in Lost Creek, West Virginia.  How far is that from here?

A	About an hour.

Q	Did you drive?

A	My mom drove me.

Q	Drove you today?  Are you able to - - how far does your mom live from you?

A	About five minutes.

Q	Do you see her often?

A	Talk to her on the phone.  We don't get along very well.

Q	You don't get along very well?

A	Uh-uh.

Q	Anyone given you - - any adult given you assistance in the house?

A	My mom and her boyfriend and my sister.

Q	Are you able to take the kids out to, I don't know, to do anything, go to a park, walk around?  Is there anything you do with the kids, I guess is what I'm asking?

A	This time of year we haven't been going nowhere.

Q	Well, what about last summer?

A	They were going to the parks and recreation last summer where they were down - they go to the park but I wasn't with them.  They had the people down there watching them.

Q	Is there anything you do, do you go swimming?

A	No.

Q	Did you used to go swimming in the summer?

A      I used to.  I don't since I hurt my back.

Q      Not since you hurt your back?

A      Since the left leg drawed up on me, I'm scared to get in water over my head.

Q      Does your house have any flights of stairs inside?

A      Uh-uh.

Q      How about getting into the house or out of the house?

A      One step.

Q      Can you do that?

A      The one step?

Q      You don't have any problems with that?

A      No.

Q      Now let's say you've been sitting for a while, and I imagine after a while it hurts your back, what do you do to relieve it?

A      Move around.

Q      Are you able to fix meals for your children?

A      I do a lot of cooking in the crock pot.  That way it's easier and usually it's done. They can't come in demanding I want to eat now and it's less stressful.  It's easier.  Salisbury steaks is one of our favorites, frozen stuff.

*             *             *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      Are you able based on your view of the file and from the testimony able to characterize the Claimant's past work?

A     Yes, I am.

Q     Okay.  Then please do.

A     Okay.  The last job, which was an aide, psychiatric aide with handicapped individuals is classified by the DOT as medium, semi-skilled work with an SVP of 4.  Before that there was employment in the record as a cashier at an Excelon [phonetic] convenience store.  This is classified as light, unskilled work.  Also, cashier at Hill's department store, light, unskilled, and before that with Sign Systems Company, I think, a shipping and receiving addresser addressing packages for shipment.  This is sedentary, unskilled.  And before that a cashier for MacDonald's fast foods, which would be light, unskilled.

*          *          *

Q     Let me ask you [INAUDIBLE] questions, Mr. Mahler.  Assume an individual of Claimant's age, education, and vocational experience.  Assume the individual can perform sedentary work with a sit-stand option, and no posturals except what's necessary to sit and stand, and in addition requires - - and no heights and hazards and requires low stress work.  And in this case by that it would be routine and repetitive work, unskilled entry level limited to one and two-step instructions and working with things and not people.  Would there be jobs in the national economy or other regional economies that such an individual could perform?

A     Yes, Your Honor.  There are sedentary, unskilled jobs that would comply with your hypothetical.  Some examples I could offer would be that of an inspector-checker of small products.  There are 150 in the local labor market which is northern West Virginia and southwestern Pennsylvania, 150 local and 37,000 nation.  There are also sorters and graders, 100 local, 20,000 nation.  There are assemblers of small products, 650 local, 149,000 nation.  And

there are waxers of glass products, 160 local, 66,000 nation. These are all sedentary, unskilled jobs with a sit-stand option.

Q     If you added to that limitation that because of pain and/or because of mental impairments the individual would have concentration problems that would make them off task for up to one-third of the work day, would that erode the occupational base?

A     Yes, it would. These are all competitive jobs, Your Honor, and that assumes the ability for the worker to stay on task and function at least 85 to 90 percent of the work day. If they were off task one-third of the day they could not sustain these jobs.

ALJ     Okay. Ms. Carpenter.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q     The jobs that you named in the first hypothetical part of that hypothetical was no posturals, no stooping?

A     Yes.

Q     Kneeling, crawling, bending of any type. Are these jobs able to be performed with no posturals whatsoever?

A     You're sitting at a work station such as this and as the Judge indicated the only posturals would be standing and sitting and you don't have to bend over or stoop or crawl to do these jobs.

*          *          *

E.     Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the

Claimant's alleged impairments affect her daily life.

• Washes, bathes, dresses, and shaves herself (Tr. 87)

• Prepares meals including cereal, pop tarts, soups, sandwiches, and frozen foods (Tr. 88)

• Dusts furniture and washes dishes (Tr. 88)

• Pays bills and manages bank accounts (Tr. 88)

• Runs and errands and does child care (Tr. 88)

• Shops for food, medication, and cigarettes (Tr. 89)

• Watches television two to five hours per day (Tr. 89)

• Listens to the radio one hour per day (Tr. 89)

• Has interests of swimming, gardening, and attending movies (Tr. 89)

• Moderate obesity (Tr. 180)

• Smokes a pack and a half of cigarettes per day (Tr. 414)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in discrediting her subjective statements regarding the severity of her impairments solely because they are not supported by objective medical evidence, and (2) in ignoring or mis-interpreting the opinions of physicians.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered Claimant's testimony regarding the severity of her symptoms and properly considered the medical evidence at issue.

B.    <u>The Standards</u>.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508,

416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled,

the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and

determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3)

whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can

perform her past work; and 5) whether the claimant is capable of performing any work in the

national economy. Once claimant satisfies Steps One and Two, she will automatically be found

disabled if she suffers from a listed impairment. If the claimant does not have listed impairments

but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can

perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

The ALJ's Credibility Analysis

The first issue is whether the ALJ sufficiently examined Claimant's testimony before

finding it not fully credible. Claimant argues the ALJ discredited her testimony without giving

adequate reasons. Commissioner argues the ALJ properly evaluated Claimant's testimony.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in

Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective

symptoms, he must first show the existence of a medically determinable impairment that could

cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant

has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider

all evidence, including the claimant's statements about his symptoms, in determining whether the

claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need

not credit them to the extent they are inconsistent with the objective medical evidence or to the

extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. As long as the ALJ followed the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them. Milburn Colliery Co., 138 F.3d at 528. A decision with substantial evidence adequately explains its reasoning. Id.

The record reveals the ALJ followed the first step of the Craig analysis by finding Claimant has medically determinable impairments that could cause the symptoms alleged. (Tr. 19). The ALJ stated that "The evidence of record establishes a basis for a degree of pain and functional limitation associated with the claimant's impairments." Id. Indeed, Claimant has not challenged the ALJ's findings at this step.

Although the ALJ found Claimant had impairments that could cause the symptoms alleged, the ALJ declined to fully credit Claimant's testimony. Id. The ALJ found "The claimant's testimony regarding the degree of her limitation is not fully credible." Id. The question is whether the ALJ followed correct procedures in finding the testimony not credible.

At this point the Court cannot say substantial evidence supports the ALJ's conclusion and therefore the case must be remanded for further consideration of Claimant's testimony regarding the severity of her impairments. Craig permits an ALJ to discredit a claimant's testimony where medical evidence contradicts subjective complaints. Craig, 76 F.3d at 595. However, an ALJ may not discredit subjective complaints merely because medical evidence fails to support the degree of pain alleged. Id. In relevant part, the ALJ wrote:

> [The evidence] fails to support the support the disabling degree [of impairment] alleged by the claimant. The claimant's testimony regarding the degree of her limitation is not fully credible. To begin, the record reflects that the claimant experienced "moderate pathology" in the form of

> a herniated disc at L4/5. (citation omitted) This pathology, however, should be accommodated by reducing the claimant's exertional level capacity to sedentary work. (citation omitted).

(Tr. 19). This statement seems to indicate objective medical evidence of the degree of pain alleged is required. After all, the ALJ stated the evidence "fails to support" Claimant's subjective complaints. (Tr. 19). Yet Claimant may have legitimate subjective complaints aside from what medical evidence can tell. Craig, 76 F.3d at 595. Therefore, this case must be remanded for further consideration of Claimant's subjective symptoms.

On remand, the ALJ should consider Claimant's subjective complaints in accordance with the requirements of Craig. The ALJ has already successfully completed the first Craig step by finding Claimant has medical impairments that could produce the symptoms alleged. (Tr. 19). The ALJ must now consider "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 595. He must evaluate not just " the claimant's statements about her pain, but also 'all the available evidence,' including the claimant's medical history, medical signs, and laboratory findings . . . and any other evidence relevant to the severity of the impairment, such as . . . the claimant's daily activities, specific descriptions of the pain, and any medical treatment." Id. Claimant's subjective symptoms "may not be dismissed merely because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id.

Commissioner argues the ALJ substantially credited Claimant's subjective complaints and thoroughly considered Claimant's testimony. It may be that Commissioner accurately assessed the effect Claimant's subjective impairments have upon her. It is also true that the ALJ substantially discussed the contents of Claimant's testimony. (Tr. 18-19). Indeed, the ALJ may

reach the same determination on remand. Yet these are not the relevant inquiries. The ALJ's opinion indicated he failed to credit Claimant's subjective complaints regarding the degree of her impairment because of a lack of evidentiary support. (Tr. 19). Yet the ALJ should have considered Claimant's credibility aside from evidentiary support.

II.

The ALJ's Consideration of the Opinions of Claimant's Physicians

The next issue concerns whether the ALJ properly considered the opinions of Dr. Lauderman and Dr. Pearse, who treated Claimant. Claimant alleges the ALJ gave inadequate weight to their opinions. Commissioner contends the ALJ properly considered these opinions.

A treating physician's opinion will be entitled to controlling weight under some circumstances. The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

The Court first considers the opinion of Dr. Lauderman at issue. Dr. Lauderman completed an assessment for an insurance company in March 2004 in which he stated Claimant was totally disabled. (Tr. 393). The evaluation was completed on an insurance company provided form. The form asked the question "How many hours per day can this patient[?]" Id. It then listed numbers from 0-8 and asked that one be circled. Id. On the side of the numbers the form asked the person completing it to circle whether a particular activity could be done continuously or whether the person doing it required breaks. Id. For the number of hours, Dr. Lauderman scratched out "0" and wrote in 15 minutes for standing, sitting, and driving. Id. He wrote in 8 minutes for walking. Id. Dr. Lauderman stated Claimant could perform each activity with breaks. Id. Later in the form, Dr. Lauderman stated he believed Claimant had the capacity for light work, with light work defined as "Frequent lifting or carrying objects 0-10 lbs. and/or capacity to lift 10 lbs. maximum occasionally."[5] Id.

The ALJ considered this assessment in his opinion. He stated he did "not find persuasive Dr. Lauderman's opinion that the claimant is totally disabled from any and all work." (Tr. 20). However, the ALJ did agree with "Dr. Lauderman's restrictions with regard to the claimant's avoidance of lifting more than ten pounds as well as the avoidance of postural activities." Id.

Claimant contends the Dr. Lauderman's opinion shows Dr. Lauderman believed Claimant could only sit, stand, and drive for a total of fifteen minutes per day, and walk for only eight minutes per day. Claimant argues the ALJ failed to explain his reasons for not crediting this opinion. Commissioner argues Dr. Lauderman's assessment shows he believed Claimant could

---

[5] The form actually defined light as including the ability to lift 20 pounds occasionally. (Tr. 393). Dr. Lauderman scratched this out and substituted 10 pounds. Id.

only perform sitting, standing, and driving for fifteen minutes at a time, and that the ALJ properly considered the opinion.

The Court believes substantial evidence supports the ALJ's consideration of Dr. Lauderman's opinion. Read literally, the form Dr. Lauderman completed shows him to believe Claimant can only sit, stand, and drive for 15 minutes per day. Id. She can drive for 8 minutes per day. Id. Furthermore, she requires breaks during those few minutes. Id. Presumably Claimant would be laying down during the other more than 23 hours of the day. The Court agrees with Commissioner this is a ludicrous interpretation. The only sensible interpretation is that Dr. Lauderman believes Claimant can only stand, sit, and drive for 15 minutes at a time, and walk for 8 minutes at a time, and requires a break before doing each activity again. The ALJ fully accounted for this limitation by including a sit/stand option in the RFC he assigned to Claimant.[6] (Tr. 20). Furthermore, to the extent Dr. Lauderman's assessment rated Claimant as totally disabled, it is internally inconsistent since on the same page Dr. Lauderman stated Claimant was disabled, he stated she had the capacity for light work. (Tr. 393). The ALJ was not required to credit this opinion. 20 C.F.R. § 416.972(d)(2).

The next issue concerns whether the ALJ adequately discussed the opinion of Claimant's treating psychologist, Dr. Pearse. Dr. Pearse diagnosed Claimant with generalized anxiety disorder and acute stress disorder. (Tr. 381). He also stated she had a poor ability to deal with work stresses and had only a fair ability to perform in many other areas. (Tr. 382-84).

---

[6] Courts have interpreted the term "sit/stand option" to mean a person has the option to alternate between sitting and standing at will. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); Zarkowski v. Barnhart, 417 F. Supp. 2d 758, 762 (D.S.C. 2006); Perkins v. Apfel, 101 F. Supp. 2d 365, 377-78 (D. Md. 2000).

The ALJ found Claimant had a severe impairment of depression. (Tr. 17). He evaluated Claimant's mental impairments during the third step of the sequential evaluation process to determine if Claimant was entitled to presumptive disability. (Tr. 17-18); 20 C.F.R. § 404.1520. The ALJ determined Claimant did not meet the requirements for presumptive disability and therefore followed the correct course in determining Claimant's residual functional capacity. (Tr. 18); 20 C.F.R. § 404.1520. The ALJ did not consider Claimant's mental impairments in determining her residual functional capacity. (Tr. 18-20).

The Court concludes the ALJ erred by failing to consider Dr. Pearse's opinion regarding Claimant's mental limitations when determining her residual functional capacity. It is well established in this circuit that opinions from treating physicians are entitled to great weight. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (stating that "Courts often accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant"). The ALJ did not need to credit Dr. Pearse's opinion if other persuasive evidence existed. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Yet the ALJ did not discuss Dr. Pearse's opinion at all in his residual functional capacity assessment. As such, the Court cannot say substantial evidence exists and the case must be remanded for further consideration.

The failure to consider Dr. Pearse's opinion regarding Claimant's mental limitations is indicative of more general errors the ALJ made regarding Claimant's mental limitations when evaluating her residual functional capacity. When determining a claimant's residual functional capacity, the Regulations require the ALJ to consider "all of your medically determinable impairments of which we are aware." 20 C.F.R. § 404.1545(a)(2). As mentioned above, the ALJ

did consider Claimant's mental limitations when considering if she qualified for presumptive disability under the Regulations. (Tr. 17-18). Yet he did not consider her mental limitations at all in his residual functional capacity assessment. (Tr. 18-20). Since the ALJ only found Claimant had two severe impairments (depression and degenerative disc disease), this means the ALJ omitted discussion of half of Claimant's severe impairments when determining her residual functional capacity. The Court is left with no indication of the limitations Claimant's mental impairments pose in her ability to obtain employment. The case must therefore be remanded so the ALJ may consider Claimant's mental impairments in his residual functional capacity assessment.

Finally, Claimant challenges the ALJ's interpretation of the findings of a consultative psychologist. Claimant notes the ALJ made the following statement when considering whether Claimant qualified for presumptive disability:

> During a mental status examination conducted on December 3, 2003, the claimant's persistence and pace were observed to be within normal limits. (citation omitted) The claimant's concentration was observed to be markedly deficient based upon the claimant's commission of three errors in subtracting serial 3's. (citation omitted) In view of the foregoing, I find that the claimant's mental impairment imposes a moderate limitation on her concentration, persistence, and pace.

(Tr. 18). Claimant contends that the ALJ's apparent averaging of her mental difficulties to arrive at a finding of moderate limitation was improper.

The Regulations recognize the inquiry surrounding concentration, persistence, and pace in determining whether Claimant is entitled to presumptive disability is one inquiry. The Regulations state that "Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and

until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.

Findings of fact are committed to the ALJ, not the courts. Hays, 907 F.2d at 1456. The ALJ's findings of fact must be upheld as long as substantial evidence exists to support them. Id. In giving the ALJ this authority, Congress has given the disability determination to a person without medical knowledge. Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984). While the ALJ may not substitute his own opinion for those of doctors, he is permitted to draw common sense inferences in the face of conflicting medical evidence. Id.; Mills v. Apfel, 244 F.3d 1, 4 (1st Cir. 2001).

The Court believes the ALJ's assessment of Claimant as having moderate impairments in the areas of concentration, persistence, and pace at the third step of the disability determination has substantial evidence to support it. The ALJ correctly noted that Claimant's persistence had been found to be normal, although her concentration had been determined to be "markedly deficient." (Tr. 18, 175). The ALJ determined Claimant had moderate limitations in concentration, persistence, and pace. (Tr. 18). Although Claimant argues this represents impermissible "averaging," the Court believes it represents a common sense approach of the type someone with legal knowledge should be expected to make. Mills, 244 F.3d at 4. Since Claimant had various strengths and weaknesses in this one area of inquiry, the ALJ chose to account for both by finding a middle amount of limitation. Id. The Court notes Claimant has not cited any statutes, regulations, or case law regarding why the ALJ's method is incorrect.

Claimant also challenges the ALJ's failure to consider marked deficiencies in concentration in his residual functional capacity assessment. As noted above, the ALJ failed to

consider any of Claimant's mental impairments in his residual functional capacity assessment. The ALJ should consider those impairments on remand.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED because the ALJ failed to properly consider Claimant's testimony and did not evaluate the effects of Claimant's mental impairments when making his residual functional capacity assessment.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: January 10, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE